**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
—————————————————————————————————————

**CRT CAPITAL GROUP ET AL.,**

                         **Plaintiffs,**         **14 Cv. 7243 (JGK)**

            **- against -**              **OPINION AND ORDER**

**SLS CAPITAL, S.A.,**

                         **Defendant.**
—————————————————————————————————————


**JOHN G. KOELTL, District Judge:**

     SLS Capital, S.A. ("SLS Capital") initiated an arbitration
proceeding before the Financial Industry Regulatory Authority
("FINRA") against CRT Capital Group LLC ("CRT Capital"), Michiel
McCarty, and Robert Gibson.  McCarty and Gibson are employed by
CRT Capital.  In response, CRT Capital, McCarty, and Gibson
filed this action seeking an order enjoining SLS Capital from
pursuing its claims in arbitration and declaring SLS Capital's
claims nonarbitrable.

     The plaintiffs have now moved for a preliminary injunction.
Because an arbitrator must determine whether SLS Capital's
claims fall within the scope of the CRT Capital-SLS Capital
arbitration agreement, CRT Capital's application for a
preliminary injunction is **denied**.  Moreover, because an
arbitrator must determine whether SLS Capital may assert claims

"on behalf of" the SLS Capital bondholders, the application for a preliminary injunction by McCarty and Gibson is also **denied**.

### I.

### A.

The following facts are taken from the Second Amended Complaint ("SAC") unless otherwise noted.

In 2004, David Elias—through BWT Holdings Limited—created SLS Capital to issue bonds to investors.  SAC ¶ 16.  SLS Capital used the bond proceeds to purchase in-force life insurance policies on the open market.  Id.  Upon the death of the insureds, SLS Capital planned to use the insurance policy proceeds to pay interest and principal to the bondholders.  Id.

In 2005, CRT Capital agreed to advise SLS Capital; in exchange, CRT Capital received fees and an equity stake in SLS Capital.  SAC ¶¶ 17, 19.  The parties' Engagement Letter provides that "[a]ny dispute between the parties to this Engagement Letter shall be settled by arbitration before the facilities of the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. in the City of New York . . . ."  Regan Decl. Ex. 1.  In September 2007, CRT Capital sold its equity stake in SLS Capital and terminated the advisory relationship.  SAC ¶ 25.

In 2008, SLS Capital liquidated its entire portfolio of life insurance policies, and Elias absconded with SLS Capital's

assets.  SAC ¶¶ 28-29.  Thereafter, Elias reportedly died in
Singapore.  SAC ¶ 36.  In October 2009, SLS Capital was placed
into liquidation by an order of the Luxembourg District Court,
and Me Baden was appointed as receiver.  SAC ¶ 38.  By an order
dated July 25, 2012, the United States Bankruptcy Court for the
Southern District of New York recognized the Luxembourg
liquidation as a foreign main proceeding and Baden as a foreign
representative of SLS Capital.  See In re SLS Capital S.A., No.
12-br-12707 (Bankr. S.D.N.Y. July 25, 2012).

**B.**

On July 15, 2014, SLS Capital, through its liquidator,
filed a Statement of Claim with FINRA against CRT Capital.
Delaney Aff. Ex. 3.  The Statement of Claim alleged eleven
causes of action: 1) "Fraud on the Bondholders (Misleading
Marketing Materials)"; 2) "Negligent Misrepresentation to the
Bondholders (Misleading Marketing Materials)"; 3) "Aiding and
Abetting Fraud on the Bondholders"; 4) "Fraud on the
Bondholders"; 5) "Negligent Misrepresentation to the
Bondholders"; 6) "Breach of Fiduciary Duty (Fiduciary Duty to
SLS)"; 7) "Breach of Fiduciary Duty (Fiduciary Duty to SLS in
insolvency)"; 8) "Negligence"; 9) "Unjust Enrichment"; 10)
"Breach of Contract"; and 11) "Common Law Indemnification."  Id.

On July 23, 2014, SLS Capital filed a complaint in this
Court against CRT Capital, CRT Associates LLC, Michiel McCarty,

3

and Robert Gibson.  The claims in the complaint are nearly
identical to those in the FINRA Statement of Claim, except the
complaint alleged claims against McCarty and Gibson, including a
claim that they aided and abetted CRT Capital's breach of
fiduciary duty.  Compare Delaney Aff. Ex. 1, with Delaney Aff.
Ex. 3.  On September 8, 2014, CRT Capital filed the Original
Complaint in this matter, seeking to enjoin SLS Capital from
pursuing arbitration and requesting a declaratory judgment that
SLS Capital's claims are not arbitrable.  Delaney Aff. Ex. 5.

In a letter dated September 9, 2014, CRT Capital informed
FINRA that it believed the dispute was not arbitrable and that
it had initiated this action to enjoin the arbitration.  Delaney
Aff. Ex. 6.  In a memo dated September 15, 2014, FINRA informed
CRT Capital that if FINRA did not receive a Statement of Answer,
FINRA may bar CRT Capital from presenting any defenses or facts
at the arbitration hearing.  Delaney Aff. Ex. 7.  In a memo
dated September 19, 2014, FINRA informed CRT Capital that the
arbitrator rankings list was due October 13, 2014, and if CRT
Capital failed to provide rankings by that date, FINRA would
conclude that CRT Capital had approved all of the arbitrators on
the list.  Delaney Aff. Ex. 10.  In a letter dated September 22,
2014, CRT Capital again informed FINRA that it believed the
claims were not arbitrable.  Delaney Aff. Ex. 9.

On September 29, 2014, CRT Capital filed an order to show cause for a temporary restraining order and a preliminary injunction in this action.  On October 1, 2014, the Court denied the application for a temporary restraining order as moot.  On October 2, 2014, FINRA agreed—at the parties' request—that the dates for the selection of arbitrators and for the selection of a preliminary conference would be adjourned until November 21, 2014.  That date has since been extended to December 5, 2014.

On October 13, SLS Capital filed an Amended Statement of Claim with FINRA that added Michiel McCarty and Robert Gibson as respondents.  Regan Decl. Ex. 2.  The Statement of Claim also added an additional cause of action specifically against McCarty and Gibson, namely that those defendants aided and abetted CRT Capital's breach of fiduciary duty.  Regan Decl. Ex. 2, at 38. CRT Capital in turn filed an Amended Complaint in this action on October 16, 2014, adding McCarty and Gibson as plaintiffs.  On November 24, 2014, the plaintiffs filed their Second Amended Complaint, identifying 28 U.S.C. § 1331 and 9 U.S.C. § 203 as the bases for subject matter jurisdiction.

## II.

The parties dispute whether the Court has subject matter jurisdiction over this action.  The Original Complaint and the First Amended Complaint identified diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332(a) as the basis for

5

subject matter jurisdiction.  That was incorrect.[1]  The
plaintiffs now contend that 28 U.S.C. § 1331 and 9 U.S.C. § 203
provide this Court with subject matter jurisdiction.  That is
correct.

### A.

Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C.
§ 201 *et seq.,* implements the Convention on the Recognition and
Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T.
2517, 330 U.N.T.S. 38, (the "New York Convention").  Section 203
provides that "[a]n action or proceeding falling under the
Convention shall be deemed to arise under the laws and treaties
of the United States."  Section 202, in turn, "describes which
actions 'fall under the Convention.'"  Sarhank Grp. v. Oracle
Corp., 404 F.3d 657, 660 (2d Cir. 2005).  That section provides
that "[a]n arbitration agreement or arbitral award arising out
of a legal relationship, whether contractual or not, which is
considered as commercial, including a transaction, contract or

---

[1]    CRT Capital is a limited liability corporation, one of its
members is a citizen of a foreign state, and "a limited
liability corporation has the citizenship of each of its members
for the purposes of diversity jurisdiction."  See Handelsman v.
Bedford Vill. Assocs. Ltd. P'ship, 213 F.3d 48, 51–52 (2d Cir.
2000).  McCarty and Gibson are citizens of Connecticut.  SLS
Capital is a citizen of Luxembourg, and all of its corporate
officers and functions are located in Luxembourg.  Accordingly,
this Court lacks jurisdiction under 28 U.S.C. § 1332(a)(2) and
(3).  See Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826,
828 (1989)

agreement described in section 2 of this title, falls under the Convention."  It also excludes an agreement or award arising out of such a relationship that is entirely between citizens of the United States, unless it involves certain other international aspects.

The Engagement Letter between SLS Capital and CRT Capital plainly is an arbitration agreement arising out of an international commercial agreement—SLS Capital is a foreign entity.  However, Gibson and McCarty argue, without supporting case law, that they are not parties to an arbitration agreement under the New York Convention.

This argument is unpersuasive.  Gibson and McCarty are both associated persons of a FINRA member—CRT Capital—and SLS Capital is a foreign entity.  Under Rule 12200 of the FINRA Code of Arbitration Procedure for Consumer Disputes (the "FINRA Code"), parties must arbitrate a dispute under the FINRA Code if: "[a]rbitration . . . is . . . [r]equested by the customer; [t]he dispute is between a customer and a member or associated person of a member; and [t]he dispute arises in connection with the business activities of the member or the associated person."  Under the FINRA Code, "a person formerly associated with a member is a person associated with a member."  Rule 12100(r).

In Kidder, Peabody & Co. v. Zinsmeyer Trusts Partnership, 41 F.3d 861 (2d Cir. 1994), the Second Circuit Court of Appeals

held that the National Association of Securities Dealers, Inc. ("NASD")—the predecessor to FINRA—rules and regulations include "the duty to submit to arbitration upon a customer's demand.  As such, the NASD provision [requiring arbitration of disputes with customers] constitutes an 'agreement in writing' under the Federal Arbitration Act, 9 U.S.C. § 2."  Id. at 863.  The Court of Appeals re-affirmed this principal for disputes arising under the FINRA Code in UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc., 660 F.3d 643 (2d Cir. 2011), holding that "[a]s a FINRA member, therefore, UBS is bound to adhere to FINRA's rules and regulations, including its Code and relevant arbitration provisions contained therein.  With respect to these provisions, the Federal Arbitration Act, 9 U.S.C. § 1 et seq., 'requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms.'"  Id. at 649 (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989)).

Kidder and West Virginia University Hospitals made clear that membership in an exchange that requires arbitration constitutes an "agreement in writing" to arbitrate under 9 U.S.C. § 2.  And § 202 provides that a commercial arbitration "agreement described in section 2 of this title[] falls under

the Convention."  Therefore, the dispute between the individual plaintiffs and SLS Capital falls under the New York Convention. [2]

## B.

SLS Capital next argues that the implementing legislation for the New York Convention provides only three judicial remedies: compelling arbitration, 9 U.S.C. § 206, appointing arbitrators, id., and confirming arbitration awards, id. § 207. Thus, according to SLS Capital, the Court lacks jurisdiction to enjoin an arbitration proceeding.  This argument is ultimately unpersuasive.

In International Shipping Co. v. Hydra Offshore, Inc., 875 F.2d 388 (2d Cir. 1989), the plaintiff brought an action in the Southern District of New York, seeking an order that neither compelled arbitration nor confirmed an arbitration award.  Id. at 389-90 (citing Int'l Shipping Co. v. Hydra Offshore, Inc., 675 F. Supp. 146 (S.D.N.Y. 1987)).  The district court concluded that it lacked jurisdiction under the New York Convention because § 203 only provides jurisdiction over actions seeking "either to compel arbitration or to enforce an arbitral award."

---

[2]   Whether the Engagement Letter between CRT Capital and SLS Capital in fact governs this dispute, and whether the dispute between the individual plaintiffs and SLS Capital in fact falls under FINRA Code, "depends entirely upon [the Court's] view of the merits of the case, and therefore does not involve a lack of subject matter jurisdiction."  Sarhank, 404 F.3d at 660.

Id. at 391 n.5.  In a footnote, the Second Circuit Court Appeals agreed, noting that the district court had "appropriately rejected" § 203 as a basis for jurisdiction.  Id.

After Hydra Offshore, the Court of Appeals slightly expanded the scope of § 203.  In Borden, Inc. v. Meiji Milk Products Co., the court held that § 203 provides jurisdiction to "entertain[] an application for a preliminary injunction in aid of arbitration."  919 F.2d 822, 826 (2d Cir. 1990).  A number of district courts, within and outside this Circuit, thus have held that § 203 provides a basis for jurisdiction only if a party seeks (a) to compel jurisdiction, (b) to confirm an arbitration award, or (c) to enjoin a proceeding in "aid of arbitration." See, e.g., Goel v. Ramachandran, 823 F. Supp. 2d 206, 215–17 (S.D.N.Y. 2011) (summarizing cases); Republic of Ecuador v. ChevronTexaco Corp., 376 F. Supp. 2d 334, 349 (S.D.N.Y. 2005); Gerling Global Reinsurance Corp. v. Sompo Japan Ins. Co., 348 F. Supp. 2d 102, 104–05 (S.D.N.Y. 2004); see also Ingaseosas Int'l Co. v. Aconcagua Investing Ltd., No. 09-23078-CIV, 2011 WL 500042, at *3 (S.D. Fla. Feb. 10, 2011) (holding that it lacked jurisdiction because the "case law overwhelmingly confirms that the Convention provides for causes of action only for recognition and enforcement of arbitral awards"), aff'd, 479 F. App'x 955 (11th Cir. 2012); URS Corp. v. Lebanese Co. for Dev. & Reconstruction of Beirut Cent. Dist. SAL, 512 F. Supp. 2d

10

199, 207–08 (D. Del. 2007) (holding that § 203 does not provide jurisdiction over an action seeking to enjoin an arbitration proceeding).

However, after Hydra Offshore and Borden, the Second Circuit Court of Appeals has held that jurisdiction under the New York Convention is not limited by §§ 206 and 207.  In Republic of Ecuador v. Chevron Corp., 638 F.3d 384 (2d Cir. 2011), the Court of Appeals (again in a footnote) explained that the district court had jurisdiction over the plaintiff's request to *stay* an arbitration proceeding:

> Although dicta in International Shipping Co. v. Hydra Offshore, Inc. suggests that the New York Convention is enforceable only where the party invoking its provisions seeks "either to compel arbitration or to enforce an arbitral award," 875 F.2d 388, 391 n. 5 (2d Cir. 1989), in light of the principle that the Convention should be interpreted "broadly to effectuate its recognition and enforcement purposes," Bergesen v. Joseph Muller Corp., 710 F.2d 928, 933 (2d Cir. 1983), we conclude that the case law applying the New York Convention and the federal policy favoring arbitration apply where a court acts to protect its prior judgments by staying incompatible arbitral proceedings otherwise governed by that Convention.

638 F.3d at 391 n.6.

And the Second Circuit Court of Appeals, although without explanation, has held that district courts have jurisdiction under the New York Convention to hear actions to *vacate* arbitration awards—a remedy not provided in § 206 or § 207.  See Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins.

11

Co., 668 F.3d 60, 71 (2d Cir. 2012) ("In this case, the district court had subject-matter jurisdiction under 9 U.S.C. § 203, which provides federal jurisdiction over actions to confirm or vacate an arbitral award that is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards . . . ."); Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 102-03 (2d Cir. 2006) ("Solé then brought this action in the Southern District of New York to vacate the award . . . .  The Convention on the Recognition and Enforcement of Foreign Arbitral Awards governs this dispute and provides federal subject matter jurisdiction.  9 U.S.C. § 203.").

The recent approach by the Court of Appeals is consistent with the New York Convention and the FAA.  The jurisdictional provision in Chapter 2 of the FAA provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." § 203.  The only section in Chapter 2 that defines the phrase "falling under the Convention" is § 202, which provides that "[a]n [international] arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention."  Therefore, for jurisdiction to be proper, the arbitration agreement or award "(1) must arise out of a legal

12

relationship (2) which is commercial in nature and (3) which is not entirely domestic in scope." Pike v. Freeman, 266 F.3d 78, 85 n.4 (2d Cir. 2001) (quoting Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1018 (2d Cir. 1993)) (internal quotation marks omitted) (defining an arbitration award establishing jurisdiction under the New York Convention).

Nothing in § 206 or § 207 limits the subject matter jurisdiction of federal courts.  These sections merely identify the remedies that federal courts may grant, and do "not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 394 (1982) (finding that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court).  Indeed, both sections explicitly treat subject matter jurisdiction as a separate and distinct issue.  To grant the remedies provided in those sections, the Court must first determine that it "ha[s] jurisdiction under" under Chapter 2. See § 206 ("A *court having jurisdiction under this chapter* may direct that arbitration be held . . . ." (emphasis added)); § 207 ("[A]ny party to the arbitration may apply to any *court having jurisdiction under this chapter* for an order confirming the award . . . ." (emphasis added)).

Treating §§ 206 and 207 as jurisdictional provisions confuses the subject matter jurisdiction of federal courts with their remedial authority.  Although "[j]urisdiction . . . is a word of many, too many, meanings," Arbaugh v. Y&H Corp., 546 U.S. 500, 510 (2006) (internal quotation marks omitted), there is a difference between the two.  "The nature of the relief available after jurisdiction attaches is, of course, different from the question whether there is jurisdiction to adjudicate the controversy. . . .  [T]he breadth or narrowness of the relief which may be granted under federal law . . . is a distinct question from whether the court has jurisdiction over the parties and the subject matter.  Any error in granting or designing relief 'does not go to the jurisdiction of the court.'"  Avco Corp. v. Aero Lodge No. 735, 390 U.S. 557, 561 (1968) (quoting Swift & Co. v. United States, 276 U.S. 311, 331 (1928)); see also Davis v. Passman, 442 U.S. 228, 239 n.18 (1979) ("*[J]urisdiction* is a question of whether a federal court has the power, under the Constitution or laws of the United States, to hear a case . . .; and *relief* is a question of the various remedies a federal court may make available.").

Accordingly, the Court has subject matter jurisdiction over this action.

C.

The next issue is whether the Court has the remedial authority to enjoin an arbitration proceeding that arises under the New York Convention.  A federal court should have the same power to enjoin an arbitration under the New York Convention as it would have to enjoin a domestic arbitration under Chapter 1 of the FAA.  Indeed, 9 U.S.C. § 209 explicitly provides that "Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States."

The Court of Appeals has made it clear that federal courts do have the power to enjoin domestic arbitrations even though that remedial power is not explicitly provided in Chapter 1 of the FAA.  In American Financial Services, Inc. v. Beland (In re American Express Financial Advisors Securities Litigation), 672 F.3d 113 (2d Cir. 2011), customers of Ameriprise Financial Services, Inc. ("Ameriprise") brought claims against Ameriprise before FINRA arbitrators.  Ameriprise moved to enjoin the arbitration proceeding.  Id. at 118–19.  The Court of Appeals first explained that "[w]hile the FAA's terms explicitly authorize a district court to stay litigation pending arbitration, see 9 U.S.C. § 3, and to compel arbitration, see id. § 4, nowhere does it explicitly confer on the judiciary the authority to do what the district court's Enforcement Order

15

purported to do here: enjoin a private arbitration." 672 F.3d at 140.

The Court of Appeals nonetheless held that "[if] the parties to this appeal have not consented to arbitrate a claim, the district court was not powerless to prevent one party from foisting upon the other an arbitration process to which the first party had no contractual right. . . . It makes little sense to us to conclude that district courts lack the authority to order the cessation of an arbitration by parties within its jurisdiction where such authority appears necessary in order for a court to enforce the terms of the parties' own agreement . . . ." Id. at 141. The Court of Appeals also cited with approval Satcom International Group PLC v. Orbcomm International Partners, L.P., 49 F. Supp. 2d 331 (S.D.N.Y.), aff'd, 205 F.3d 1324 (2d Cir. 1999) (unpublished disposition), where the district court held that federal courts "have a concomitant power to enjoin arbitration where arbitration is inappropriate" in cases arising under the New York Convention. Id. at 342; see also Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co., 643 F.2d 863, 868 (1st Cir. 1981) (Breyer, J.) ("[T]o enjoin a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present.").

Because the Court of Appeals has found that federal courts have the remedial power to stay domestic arbitrations, it follows that they have the remedial authority to stay international arbitrations arising under the New York Convention.  See Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co., 263 F.3d 26, 30 (2d Cir. 2001) (holding that § 206 (order to compel international arbitration) should be interpreted in accordance with precedent under 9 U.S.C. § 4 (order to compel domestic arbitration)) .

The Court therefore may enjoin an arbitration proceeding governed by the New York Convention when the parties "have not entered into a valid and binding arbitration agreement" or when the claims are "not within the scope of an arbitration agreement."  In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d at 140.

### III.

While the Court has subject matter jurisdiction over this action and can enjoin the FINRA arbitration, the issue remains whether the plaintiffs have made the necessary showing for a preliminary injunction.  They have not.

### A.

"For the last five decades, this circuit has required a party seeking a preliminary injunction to show '(a) irreparable harm and (b) either (1) likelihood of success on the merits or

17

(2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" [3] Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010) (quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979)).  A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).

     The "serious questions" prong permits the Court to grant a preliminary injunction "where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction."  VCG Special Opportunities Master Fund, 598 F.3d at 35.  The Court's analysis of the merits of the plaintiffs' application to enjoin the

---

[3]    CRT Capital insists that eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006), and Monsanto Co. v. Greertson Seed Farms, 561 U.S. 139, 156–57 (2010), require the Court to apply a four-factor test.  However, those cases involved permanent injunctions.  And in VCG Special Opportunities Master Fund, the Second Circuit Court of Appeals made clear that notwithstanding the "Supreme Court's recent opinions in Munaf, Winter, and Nken," when a plaintiff requests the Court to enjoin preliminarily an arbitration proceeding, the "serious questions" standard remains appropriate.  598 F.3d at 36–38.

arbitration in turn determines whether they will suffer
irreparable harm if the preliminary injunction is not granted.
See Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125,
129 (2d Cir. 2003) (per curiam) (holding that a party suffers
irreparable harm when forced to arbitrate a "dispute [that] was
outside the arbitration agreement").

**B.**

CRT Capital has failed to show a likelihood of success on
the merits or sufficiently serious questions going to the merits
to make them fair ground for litigation.  The ultimate issue on
the merits of the claim for injunctive relief is whether CRT
Capital, McCarty, and Gibson are correct that SLS Capital's
arbitration against them should be enjoined because the claims
are not subject to arbitration.

It is useful to consider the arbitrability of the claims
against CRT Capital before considering SLS Capital's claims
against McCarty and Gibson.  The Court follows a two-part test
to determine if SLS Capital's claims are arbitrable:

> In deciding whether claims are subject to arbitration,
> a court must consider (1) whether the parties have
> entered into a valid agreement to arbitrate, and, if so,
> (2) whether the dispute at issue comes within the scope
> of the arbitration agreement.  Before addressing the
> second inquiry, we must also determine who—the court or
> the arbitrator—properly decides the issue.

In re Am. Expess Fin. Advisors Sec. Litig., 672 F.3d at 128
(internal citations omitted).

CRT Capital disputes that there is a valid arbitration agreement.  According to CRT Capital, it agreed to arbitrate disputes with SLS Capital, not the SLS Capital bondholders, and SLS Capital's claims were brought on behalf of the bondholders—particularly claims one through five, which are styled as "fraud on the bondholders," "negligent misrepresentation to the bondholders," and "aiding and abetting fraud on the bondholders."

This argument confuses the "existence" of a valid arbitration agreement with the "scope" of a valid arbitration agreement.  The question of whether there is a valid arbitration agreement "usually arises in one of two factual scenarios: (1) whether the parties ever entered into an arbitration agreement at all, and (2) whether an arbitration agreement has expired or been terminated."  Abram Landau Real Estate v. Bevona, 123 F.3d 69, 72 (2d Cir. 1997).

The Engagement Letter provides that it shall be "governed by and construed in accordance with the laws of the State of New York."  Regan Decl. Ex. 1.  The existence of a valid agreement to arbitrate between parties is generally a question of state contract law.  Schnabel v. Trilegiant Corp., 697 F.3d 110, 119 (2d Cir. 2012).  "Under New York law, a person 'who signs or accepts a written contract is conclusively presumed to know its contents and assent to them.'"  Isaacs v. OCE Bus. Servs., Inc.,

968 F. Supp. 2d 564, 569 (S.D.N.Y. 2013) (quoting Gold v.
Deutsche Aktiengesellschaft, 365 F.3d 144, 149 (2d Cir. 2004)).
CRT Capital does not dispute that its representative signed and
dated the Engagement Letter, and CRT Capital has not identified
any basis to justify the revocation or the nonenforcement of the
Engagement Letter.  CRT Capital also does not dispute that the
SLS Capital liquidator inherited SLS Capital's rights under the
Engagement Letter.  Accordingly, there is a valid arbitration
agreement between SLS Capital and CRT Capital.  See id.

Contec Corp. v. Remote Solution Co., 398 F.3d 205 (2d Cir.
2005), is instructive on this point.  There, Contec Corporation
initiated an arbitration against Remote Solution.  Remote
Solution insisted that it had not entered into a binding
arbitration agreement with Contec Corporation; it instead
claimed to have contracted with Contec Corporation's
predecessor, Contec L.P.  Id. at 207.  And the agreement between
Contec L.P. and Remote Solution "included both a prohibition on
the assignment of rights under the Agreement and an exclusion of
third party rights." Id. at 209.

However, because the agreement provided for "arbitration of
the issue of arbitrability," the court concluded that an
arbitrator must determine the arbitrability of the parties'
dispute.  Id. at 209.  The Court of Appeals recognized that "in
the end, an arbitrator" may well "determine that the dispute

21

itself is not arbitrable because Contec Corporation cannot claim rights under the 1999 Agreement." Id. Nonetheless, the Court of Appeals held that the "purported right to enforce the 1999 Agreement is a matter of the Agreement's continued existence, validity and scope, and is therefore subject to arbitration under the terms of the arbitration clause." Id. at 211.

CRT Capital next contends that it did not agree to arbitrate claims brought "on behalf of" the bondholders. Those claims, according to CRT Capital, actually belong to the SLS Capital bondholders, and CRT Capital only agreed to arbitrate disputes arising between CRT Capital and SLS Capital. But whether CRT Capital agreed to arbitrate these claims must be determined in the first instance by the arbitrator. Under the terms of the Engagement Letter, a FINRA arbitrator must determine whether SLS Capital's claims fall within the scope of the arbitration clause.

"The question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83, (2002) (alteration in original) (quoting AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)). Notwithstanding this presumption, the Second Circuit Court of

22

Appeals has held that arbitration clauses similar to the one
here committed the parties to arbitrate whether a particular
claim is arbitrable.

In Shaw Group Inc. v. Triplefine International Corp., 322
F.3d 115 (2d Cir. 2003), the parties had agreed that "[a]ll
disputes . . . concerning or arising out of this Agreement shall
be referred to arbitration." Id. at 120. The Court of Appeals
held that because the arbitration agreement was "broadly worded
to require the submission of 'all disputes'" to the arbitrator,
the parties intended to arbitrate questions of arbitrability.
Id. at 124-25.

Similarly, in PaineWebber Inc. v. Bybyk, 81 F.3d 1193 (2d
Cir. 1996), the parties' arbitration agreement stated that "any
and all controversies . . . concerning any account, transaction,
dispute or the construction, performance, or breach of this or
any other agreement . . . shall be determined by arbitration."
Id. at 1199 (internal quotation marks omitted). The Court of
Appeals held that "[t]he words 'any and all' are elastic enough
to encompass disputes over whether a claim is timely and whether
a claim is within the scope of arbitration." Id.; see also John
Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 54 (2d Cir. 2001)
("In Bybyk, we interpreted and applied the Supreme Court's
requirement that the parties evidence a 'clear and unmistakable'
intent to submit the issue of arbitrability to the arbitrators.

We held that the parties evidenced such intent when they agreed that 'any and all controversies are to be determined by arbitration.'" (internal citation omitted) (quoting Bybyk, 81 F.3d at 1198-99)).

The arbitration clause here is broader than those in Bybyk and Shaw.  It provides that "[a]ny dispute between the parties to this Engagement Letter shall be settled by arbitration"; unlike the agreements in Bybyk and Shaw, there is no "concerning" modifier.  And there is no qualifying provision in the arbitration clause "that at least arguably covers the present dispute."  See NASDAQ OMX Grp., Inc. v. UBS Sec., LLC, 770 F.3d 1010, 1031 (2d Cir. 2014).

Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991), upon which plaintiffs rely, is not to the contrary. There, the sole shareholder and director of a corporation dissipated the assets of the corporation by making unsuitable investments and improperly investing the trust funds of clients. Id. at 116-17.  The corporation filed for bankruptcy, and the bankruptcy trustee initiated an arbitration against the corporation's stockbroker, bringing—among others—a claim for aiding and abetting fraud.  Id. at 117.  The district court enjoined the arbitration of the aiding and abetting fraud claim, id., and the Second Circuit Court of Appeals affirmed.  The Court of Appeals reasoned that the bankruptcy trustee lacked

24

standing to bring the aiding and abetting fraud claim because "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." Id. at 120.

In Wagoner, the Court of Appeals did not consider whether the district court or the arbitrator should have determined in the first instance whether the aiding and abetting fraud claim was arbitrable. That is not surprising. At no point did the bankruptcy trustee claim that the customer agreement required the arbitrator to determine questions of arbitrability. See Brief for Appellant, Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991) (No. 91-7105), 1991 WL 11009427; Appellant's Reply Brief, Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991) (No. 91-7105), 1991 WL 11009428. And the bankruptcy trustee in Wagoner bore the burden of "clearly and unmistakably" showing that the customer agreement required the arbitrator to determine the arbitrability of the trustee's claim. AT & T Techs., 475 U.S. at 649. Moreover, Wagoner was decided four years before Bybyk, where the Court of Appeals made plain that a contract requiring "any and all controversies" to be arbitrated requires an arbitrator to determine the arbitrability of a dispute. Bybyk, 81 F.3d at 1199.

CRT Capital also cites a number of cases holding that a bankruptcy trustee lacks standing to sue third parties on behalf of the estate's creditors.  See, e.g., Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC.), 721 F.3d 54, 67 (2d Cir. 2013); Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp., 351 F. Supp. 2d 79, 92 (S.D.N.Y. 2004).  But these decisions did not consider whether an arbitrator or a court must make such a determination.  And Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.), 390 B.R. 784, 790 (Bankr. S.D.N.Y. 2008), unremarkably "exempted fraudulent transfer claims from arbitration because they are statutory claims belonging to the trustee and are not claims derivative of the debtor's own rights."  Id. at 790.  SLS Capital has not brought a voidable preference claim, and the claim in Bethlehem Steel derived exclusively from the bankruptcy code.  See 11 U.S.C. § 547(b); MBNA Am. Bank, N.A. v. Hill, 436 F.3d 104, 108 (2d Cir. 2006) ("Bankruptcy courts are more likely to have discretion to refuse to compel arbitration of core bankruptcy matters, which implicate more pressing bankruptcy concerns." (internal quotation marks omitted)).

Accordingly, whether SLS Capital's claims against CRT Capital fall within the scope of the Engagement Letter must be determined in the first instance by the arbitrator.

## C.

McCarty and Gibson have also failed to show a likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for litigation.

## 1.

Unlike CRT Capital, neither McCarty nor Gibson signed the Engagement Letter with SLS Capital.  However, under FINRA Code Rule 12200, parties must arbitrate a dispute before FINRA if: "[a]rbitration . . . is . . . [r]equested by the customer; [t]he dispute is between a customer and a member or associated person of a member; and [t]he dispute arises in connection with the business activities of the member or the associated person."

The FAA, 9 U.S.C. § 1 *et seq.*, "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms."  Volt Info. Scis., 489 U.S. at 478; see also Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011) ("The interpretation of the arbitration rules of an industry self-regulatory organization (or 'SRO') such as FINRA is similar to contract interpretation . . . .").

The parties agree that Gibson and McCarty are "associated persons" under Rule 12100(r) of the FINRA Code.  Although Gibson and McCarty are no longer employed by CRT Capital, under Rule

27

12100(r) "a person formerly associated with a member is a person associated with a member."

But Gibson and McCarty's status as associated persons is insufficient, standing alone, to prove that they intended to submit the question of arbitrability to a FINRA arbitrator.  In John Hancock, the Second Circuit Court of Appeals held that a party's membership in NASD, the predecessor to FINRA, did not "evidence the parties' clear and unmistakable intent to submit the 'arbitrability' question to the arbitrators."  254 F.3d at 57; see also In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d at 128-29 (interpreting the FINRA Code and determining its scope in light of John Hancock).

Therefore, the Court must determine whether SLS Capital's claims against Gibson and McCarty are arbitrable.

## 2.

SLS Capital's claims against Gibson and McCarty fall within the scope of Rule 12200 and therefore are arbitrable.

As explained above, McCarty and Gibson are considered to be associated persons of a FINRA Member—CRT Capital.  And SLS Capital is a customer of CRT Capital.  Rule 12100(i) defines "customer" in the negative: "A customer shall not include a broker or dealer."  While the Second Circuit Court of Appeals "ha[s] avoided offering an exhaustive definition of the term," it did hold that "[t]he term 'customer' includes at least a non-

28

broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member." W. Va. Univ. Hosps., 660 F.3d at 650.  Indeed, the Court of Appeals recently made clear that "[t]he purchase of a good or service from a FINRA member creates a customer relationship.  When such a purchase is undisputed, 'there is no need for further court proceedings' concerning the existence of a customer relationship." Citigroup Global Markets Inc. v. Abbar, 761 F.3d 268, 275 (2d Cir. 2014) (internal citation omitted) (quoting Wachovia, 661 F.3d at 173).

Under the Engagement Letter, SLS Capital retained CRT Capital to serve as an advisor in relation to a Senior Life Settlement Asset Backed Securitization Bond issue.  Regan Decl. Ex. 1.  And the Amended Statement of Claim alleges that McCarty and Gibson "were the principal instruments through which CRT [Capital] acted."  Regan Decl. Ex. 2, at 3.  SLS Capital purchased advisory services from and thus was a customer of CRT Capital.  Further, the defendants do not dispute that SLS Capital's claims "arise[] in connection with the business activities of the member or the associated person."[4]

---

[4]   In West Virginia University Hospitals, which neither party cited, the Court of Appeals for the Second Circuit suggested that the phrase "arises in connection with the business activities" may require some type of "nexus" between the claims asserted and the activities that "establish[] customer status." 660 F.3d at 652–53.  However, the Court of Appeals explicitly rejected a test that would consider whether the customer's claims were a "foreseeable consequence" of the

McCarty and Gibson instead contend that the causes of action in the Statement of Claim "actually" belong to the SLS Capital bondholders, and therefore none of the causes of action are arbitrable.  But SLS Capital alone brought these claims; none of the bondholders have been joined as a party.  Whether SLS Capital has standing to bring claims on "behalf of the bondholders" is a question of standing for the arbitrator, not the Court, to decide.

In Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002), the Supreme Court distinguished between two types of "gateway" disputes.  The first was "whether the parties are bound by a given arbitration clause," a question for a court to decide.  Id. at 84.  The second was whether a binding arbitration clause "applies to a particular type of controversy."  Id.  In addressing the second issue, the Court reasoned that "'procedural questions which grow out of the dispute and bear on its final disposition' are presumptively *not* for the judge, but for an arbitrator, to decide," because the "parties would likely expect that an arbitrator would decide [that] gateway matter."  Id. (quoting John Wiley & Sons, Inc. v.

---

customer/associated person relationship.  It is sufficient to note here that SLS Capital alleges that Gibson and McCarty's tortious actions occurred while they were performing services for SLS Capital in connection with SLS Capital's engagement of CRT Capital.

Livingston, 376 U.S. 543, 557 (1964)); see also BG Grp., PLC v. Republic of Argentina, 134 S.Ct. 1198, 1207 (2014) ("[C]ourts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration.")

At best, McCarty and Gibson have raised an issue of standing—that is, whether SLS Capital may sue on behalf of the bondholders.  However, this is a "procedural gateway" question that must be determined by the arbitrator in the first instance. As Judge Wood explained:

> In the context of arbitration, the term "standing" addresses the entitlement of the party to raise a given point before the arbitrator. . . .  That is the sense in which standing to arbitrate should be understood: is the petitioner a proper party to raise a particular claim in the arbitration?  This explains why courts have not hesitated to hold that standing is a matter for the arbitrator to resolve, even though . . . arbitrability is usually an issue for the court.

Envtl. Barrier Co. v. Slurry Sys., Inc., 540 F.3d 598, 605 (7th Cir. 2008) (citing John W. Wiley & Sons, 376 U.S. at 557-58); see also United Steelworkers of Am. v. Smoke-Craft, Inc., 652 F.2d 1356, 1360 (9th Cir. 1981) ("Whether the Steelworkers had standing as a party to the arbitration to proceed with that arbitration, which had been properly commenced, was a procedural matter for the determination of the arbitrator.").

To the extent that McCarty and Gibson argue that SLS Capital is not entitled to relief because they allegedly harmed

the bondholders, not SLS Capital, that is an argument on the merits. Such a determination must be made by the arbitrator in the first instance. See AT & T Techs., 475 U.S. at 651; see also Tuminello v. Richards, No. C11-5928, 2012 WL 750305, at *3 (W.D. Wash. Mar. 8, 2012) ("[T]he Court's inquiry starts and ends with its determination that there exists a valid and enforceable arbitration agreement between the parties named in the [Statement of Claim ("SOC")], and the Court need not address the secondary question of who is the 'real party in interest' in the context of the SOC. The Court must defer that fact-finding function to the arbitrator."), aff'd, 504 F. App'x 557 (9th Cir. 2013).

## D.

Finally, because the Court has concluded that the arbitrability of SLS Capital's claims against CRT Capital must be determined by an arbitrator, and SLS Capital's claims against McCarty and Gibson fall within the scope of Rule 12200, "it necessarily follows" that the plaintiffs have "shown neither a likelihood of success on the merits, nor a sufficiently serious question going to the merits along with a balance of hardships tipping decidedly toward [them] to warrant the grant of a preliminary injunction barring arbitration." Spear, Leeds & Kellogg v. Cent. Life Assur. Co., 85 F.3d 21, 30 (2d Cir. 1996).

## CONCLUSION

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed above, they are either moot or without merit.  For the reasons explained above, the plaintiffs' application for a preliminary injunction is **denied**.  The Clerk is directed to close **Docket Number 5**.

**SO ORDERED.**

Dated:    New York, New York
          December 3, 2014              _____/s/_____
                                              John G. Koeltl
                                        United States District Judge